# EXHIBIT H

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| MICHAEL MARKOWSKI and DYNASTY WEALTH, LLC, | Index No. 650042/2018 |
| Plaintiffs, | COMPLAINT |
| -against- | |
| SEEKING ALPHA, INC. and JOHN DOES 1-5, | |
| Defendants. | |

Plaintiffs Michael Markowski ("Markowski") and Dynasty Wealth, LLC ("Dynasty"), by their undersigned counsel, as and for their Complaint against Seeking Alpha Inc. ("Seeking Alpha" or "SA") and John Does 1-5, allege on knowledge as to their actions and on information and belief as to all other matters as follows:

NATURE OF THE ACTION

1.     Defendant Seeking Alpha is the owner of the popular financial analysis website www.seekingalpha.com, an online publication filled to the brim with content curated, and at times written, by SA staff. The Seeking Alpha website, which boasts a readership of more than 10 million people around the world, contains articles commenting on all aspects of the financial industry. Content published on Seeking Alpha can—and frequently does—immediately cause dramatic market reactions and significant swings in stock prices, especially for the companies in the microcap market. Seeking Alpha is aware of the market-moving power of its published articles, and advertises the impact of its reports as the most important reason for investors to consume its content.

2.     Seeking Alpha claims to obtain most of its content from third-party contributors, many of whom are pseudonymous. But in January of 2017, SA decided to put pen to electronic

paper and author its own "take down" article of one of its qualified and trusted content contributors, Plaintiff Michael Markowski. Defendant did this for the simplest of motives: to enhance its own bottom line by satisfying the short-selling clientele that fuel Seeking Alpha's market-influencing abilities.

3.    In late 2017, Markowski concluded that Live Ventures, Inc. (ticker symbol LIVE) was significantly undervalued. From November 21, 2016, through January 1, 2017, Markowski wrote a series of articles published on Seeking Alpha evidencing a positive outlook on Live Ventures. On January 4, 2017, another Seeking Alpha author also posted research joining in Markowski's views. On January 5, 2017, however, Seeking Alpha removed both Markowski's content and that of the other author from its website without any explanation. Markowski had appeared on Seeking Alpha on at least 45 occasions over the preceding five-year period. Never before had his research been taken down. The next day, using the pseudonym "Richard Pearson," Seeking Alpha authored and published an article focused entirely on Markowski and Live Ventures, tearing down the company and defaming Markowski with allegations that he was a paid stock promoter and a fraud. The impact of this scheme was immediate. Live Ventures shares plummeted approximately 20% by the end of the day, as Seeking Alpha's readership was left with only negative content from the fictional "Richard Pearson." Markowski too suffered financial loss on his own, as he was now branded a "fraud" across the internet investment community.

4.    For years Seeking Alpha has sought to escape liability from lawsuits involving defamatory statements contained within the content that it edits, curates and publishes by relying on a federal statute that protects internet bulletin board managers and chat room moderators from liability for defamatory content published on their internet platforms. That statute, however, is

4481428-5

inapplicable here because Seeking Alpha itself, literally and/or practically, authored the

defamatory statements about Markowski, using content Markowski provided exclusively to

Seeking Alpha and a select group of paid subscribers—none of whom is Richard Pearson, the

defamatory article's purported anonymous author—as a tool to discredit Markowski and reward

readers seeking to short LIVE shares.

5.      As a result of Seeking Alpha's false and defamatory statements in the article,

Markowski and his company, Dynasty Wealth, have been injured and bring this lawsuit to

recover damages from Seeking Alpha resulting from its defamatory and tortious conduct.

PARTIES

6.      Plaintiff Michael Markowski is an individual residing in Florida.

7.      Plaintiff Dynasty Wealth, LLC is a limited liability corporation organized under

the laws of Nevada with its principal place of business in Florida.

8.      Defendant Seeking Alpha, Inc. is a Delaware corporation with its principal place

of business in New York City. Seeking Alpha owns and maintains the website found at

www.seekingalpha.com.

9.      Upon information and belief, Defendants John Does 1-5 are the person or persons,

currently unknown, who are responsible for authoring the Article and include employees or

agents of Seeking Alpha.

JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to CPLR §§ 301 and 302(a).

11.      Venue is proper in this Court pursuant to CPLR 503(a)

3

## FACTS

### The Parties

12.     Plaintiff Markowski is a 40-year veteran of the financial services industry, having worked at top-tier financial firms such as Merrill Lynch, Oppenheimer, and Donaldson Lufkin & Jenrette. Markowski has consulted for a number of public companies and served as CEO of an investment banking firm and a global financial news network. In August 1995, the SEC filed an injunctive action against Markowski in the United States District Court for the Southern District of New York. In February 1996, Markowski, without admitting or denying liability, consented to the entry of an order enjoining him from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. In August 1998, the SEC entered an order barring Markowski from any affiliation with any broker-dealer. Markowski has since offered his insights to investors and others in a manner consistent with these rulings—all of which are readily available on the internet.

13.     Markowski has been featured in Forbes, the Wall Street Journal and Fortune and is an industry expert in cash flow analyses, a critical component of predicting the performance of stocks.

14.     In 2014 Markowski founded Dynasty Wealth ("DW") and is currently its Director of Research. DW focuses on growing startup and early-stage companies with market caps below $50 million with an emphasis on the transformation from the industrial to the digital economy.

15.     DW, led by Markowski, identifies and enters into long-term consulting relationships with early-stage companies that have a scalable business and cash flow model which DW believes has the potential to reach a minimum valuation of $1 billion within five years. Based on the cash and equity incentives that DW receives it can potentially make $50 million for each company reaching a $1 billion valuation.

16.     DW also has investor members that receive invitations to invest in the companies that DW identifies as having a satisfactory market cap and growth potential. Members receive invitations to invest in these companies' early funding rounds, thereby unlocking the possibility for substantial returns.

17.     Markowski's credibility and reputation as a cash flow analysis expert is central to DW's ability to attract new clients and members.

18.     Defendant Seeking Alpha was founded in 2004 as a publisher of crowd-sourced content covering financial analyses of stocks. SA owns and operates a website called www.seekingalpha.com (the "Website"). According to the Website, SA provides readers with content written by "a network of stock analysts, traders, economists, academics, financial advisors and industry experts" and covers more than 8,000 stocks. The Website "includes curated news, research, opinion and discussion from [SA's] editorial team of 47 in addition to 15,300 individual and corporate contributors."

19.     SA's website states that it has more than 10 million unique readers spread out across the globe and claims to be one of the most utilized sources of financial news on the Internet.

20.     SA publishes Premium and Standard articles and also instablogs. According to Seeking Alpha, premium and standard articles are extensively reviewed by its editorial team, which also purports to undertake fact-checking exercises.

21.     SA has a "freemium" revenue model. All of its members receive access to a limited amount of information on a particular article or stock, which is used to entice the member to purchase a subscription to the contributor's work to read the entire article along with other materials by the contributor. An essential component of Seeking Alpha's business model is

payment for the research it publishes. Subscribers pay fees to Seeking Alpha to receive, in advance of posting to the public, articles selected by Seeking Alpha. Seeking Alpha uses this mechanism to alert short sellers of a negative report in advance of public release; short sellers then build a significant position, which is enhanced by the release of the reports. The result is enormous downward pressure on the share price of the target—all orchestrated by Seeking Alpha.

22.    Seeking Alpha asserts that it receives a majority of its content from third-party contributors, many of whom are anonymous. SA claims that contributors may remain anonymous "due to regulations at their workplace or other factors" that may dissuade authors from revealing their real names. SA, however, also claims that it possesses the author's real name and contact information.

23.    In order to satisfy its readership and populate the Website with as much content as possible, SA employs an in-house news team that develops and produces content. SA edits and suggests content to third-party providers and works alongside those authors to mutually co-author content.

24.    According to Seeking Alpha's Editorial Principals, SA's editors are not required to disclose their respective positions in companies featured in the articles they edit. In contrast, authors of articles published on SA "are required to disclose personal positions in stocks they write about."

25.    SA reserves the right to "monitor, censor, edit, move, delete, and/or remove any and all Content posted on" the Website. In addition, all material posted on the SA website becomes the property of SA, which SA may republish as it wishes.

4481428-5

Markowski Becomes an SA Premium
<u>Author and Writes Articles About LIVE</u>

26.     Markowski began contributing content to SA in or about 2012. Markowski authored approximately 45 articles about a variety of stocks and financial issues over the course of his relationship with Seeking Alpha.

27.     On more than one occasion, representatives of SA told Markowski that they preferred to publish content focused on short stock positions, as these were more interesting, relevant and attractive to SA's readership.

28.     A majority of Markowski's articles regarding stocks advised readers to take short positions and analyzed the likelihood of a stock price's decline in value over a short period of time. On November 21, 2016, however, Markowski published on SA an article expressing positive views regarding the future value of Live Ventures Inc. ("LIVE"). Markowski's articled, entitled "Headwinds for S&P; Tailwinds for Small and Micro-Caps," expressed his recommendation to buy LIVE shares, along with five other microcap companies and several ETFs.

29.     In or about November 2016, Daniel Shvartsman, the Director of Marketplace Contributor Success at SA, approached Markowski and asked whether Markowski would be interested in becoming an SA premium author ("Premium Author"). Premium Authors are SA authors who offer paying subscribers value-added services to complement the free articles the authors have available on SA.

30.     Markowski agreed to SA's request and was excited at the opportunity to grow his reader base with a group of paid subscribers. Markowski knew that he would be able to leverage a paid subscriber base at SA into growing his DW member base.

4481428-5

31.     Shvartsman advised Markowski on how to maximize the benefits of the Premium Author service. On December 19, 2016, for example, Shvartsman told Markowski via email that he should "start prepopulating your premium author service with some posts (at least 2-3) so that your first subscribers don't arrive to find an empty forum. You may also want to consider adding a 'welcome' article to your subscription area letting new subscribers know what to expect; it's not a necessity, just a nice touch."

32.     Over the following days Markowski began to populate his Premium Author subscriber database with content. The first two articles he wrote, dated December 20 and 21, 2016, were locked and not available to any of Seeking Alpha's members until he officially launched as a Premium Author. The materials, of course, were fully and immediately available to Seeking Alpha management and its editorial team.

33.     To kick off his paid subscriber service, Markowski directed his initial content at LIVE. Markowski restated and expanded upon his positive view of LIVE's long-term potential for growth and success and forecast that the value of the company's stock would dramatically increase over the coming months and years. Markowski held no position in LIVE and was not paid by the company for any of his content, facts he prominently disclosed at the top of each of his articles.

34.     Markowski officially launched his SA Premium Author service on December 23, 2016. It was only on this date that SA readers who signed up for Markowski's Premium Author service were able to access the private content that Markowski offered exclusively to his subscriber network. The subscriber base was very small by year-end 2016, only 22 readers.

4481428-5

35. Markowski authored nine articles about LIVE between November 21, 2016 and January 1, 2017 that were featured on the Seeking Alpha website, either exclusively to Markowski's subscribers or publicly to all of Seeking Alpha's more than 10 million readers.

36. Three of Markowski's nine articles were freely available to all of Seeking Alpha's readers. The remaining six articles were exclusively available to Markowski's 22 paid subscribers and to Seeking Alpha management as the host of the website. Markowski was provided with a list of the subscribers' names.

37. The titles of the articles, dates of publication, and availability of the articles (either publicly or exclusively to Markowski's subscribers) are as follows:

| DATE | ARTICLE TITLE | AUDIENCE |
|---|---|---|
| Nov. 21, 2016 | Headwinds for S&P; Tailwinds for Small and Micro-Caps | Publicly Available |
| Dec. 20, 2016 | Live Ventures (LIVE) Shares Should Be Purchased at Market | Premium Author Subscribers Only on or after December 23, 2016 |
| Dec. 21, 2016 | Case Studies Support My Prediction: "LIVE Will Be 2017's Top Stock" | Premium Author Subscribers Only on or after December 23, 2016 |
| Dec. 27, 2016 | Continue to Purchase LIVE Shares At Market | Premium Author Subscribers Only |
| Dec. 28, 2016 | Do NOT SELL LIVE Shares | Premium Author Subscribers Only |
| Dec. 28, 2016 | LIVE Shares Have A New Price Limit | Premium Author Subscribers Only |
| Dec. 30, 2016 | Live Ventures Diagnosed with Second Rare Cash Flow Anomaly | Publicly available |
| Dec. 30, 2016 | Short Activity Picking Up Due to Misreading of Rare Balance Sheet Anomaly | Premium Author Subscribers Only |
| Jan. 1, 2017 | 2016 Review, 2017 Predictions And Top Pic | Publicly available |

38. In compliance with SA's Editorial Principles and author disclosure requirements, all nine of Markowski's articles about LIVE contained express disclaimers that Markowski did

not hold any interest in, and was not compensated by, LIVE. These disclaimers were also necessary and appropriate to comply with federal anti-fraud statutes, 15 U.S.C. § 77q(b).

39.    Markowski was not alone in publishing a positive outlook on LIVE. Another SA contributor named Pantho Investments published an article touting the benefits of buying and holding LIVE stock on January 4, 2017. A copy of that article is attached as Exhibit A. SA requires contributors to disclose whether they are paid by the target company for their content or hold positions in that company; like Markowski, Pantho Investment was not paid by LIVE and did not own any interest in the company.

40.    The Pantho Investments article, titled "Live Ventures: Vintage Stock Acquisition Should Drive Share Price Higher As Company Positions Itself To Become A Diversified Conglomerate," echoed Markowski's positive outlook on the company and predictions that the stock would substantially increase in price over the coming year. The article detailed the history of LIVE and the CEO's background and, like Markowski, compared LIVE to Berkshire Hathaway, one of the most successful companies in the world.

41.    According to the article, Pantho Investments forecast that shares of LIVE stock "could potentially be worth north of $100 (over 300% upside from $24) and momentum since November has already been explosive, doubling from roughly $11 per share to the current $24 per share as the market begins to digest the scope of LIVE's clearly improved fundamentals and story." Likewise, Markowski advised that he believed LIVE's stock price could reach as high as $180 per share. However, unlike Pantho Investment's article, which was available to all of SA's 10 million members, Markowski's articles containing his price projections were only made available to his 22 paid subscribers and to Seeking Alpha management.

42.    From November of 2016 through January 5, 2017, as Markowski and Pantho Investments wrote positively on LIVE's outlook, LIVE's stock price increased, from a closing price of $15.30 (adjusted for a 6-1 split) to $23.03. This share-price increase made LIVE shares an inviting target for short sellers, including many SA paid subscribers who use the Website in furtherance of their short-selling schemes.

Seeking Alpha Authors and Publishes
Libelous Article About Markowski

43.    After the close of the market on January 5, 2017, without prior notice or explanation, SA pulled down Markowski's six articles that had been available to his 22 subscribers and also his one other December 30, 2016 article that was specific to LIVE. SA also removed Pantho Investments' January 4 article. Markowski was not given any immediate explanation for SA's decision to pull down all of his LIVE-related content.

44.    The removal of the positive content written by Markowski and Pantho Investments enabled SA to create the appearance that there was no positive research on LIVE or, alternatively, that the earlier research was so flawed that it violated SA's guidelines. Either was advantageous to short sellers, who stood to profit if (and when) SA published a negative article about LIVE, particularly where SA had the ability to position such an article at the top of its news feed. No doubt many had already received the soon-to-be-published negative report on LIVE and Markowski.

45.    The following day, January 6, 2017, SA rewarded its short-seller customer base. It published an article titled "Live Ventures Exposed: Massive Paid Promotions, Heavy Accounting Manipulation, Deficient Auditor And More" (the "Article") that SA claimed was authored by someone named Richard Pearson. The Article was made publicly available on the SA website, meaning that SA made it available to all of SA's readership. In advance of publishing the Article

4481428-5

to all of SA's members, SA provided the Article to a select group of hedge funds focused on
short-selling stocks. A copy of the article is attached as Exhibit B.

46.    Upon SA publishing the Article, LIVE shares declined by more than 20%, almost
instantly on heavy volume fueled by the sensational charges in the Article, which were enhanced
by the strategy that SA had deployed to remove positive authors, such as Markowski.
Throughout the day SA plastered the Website with three sensational headline stories about the
LIVE share-price decline, including one heading that alluded to Pearson's uncovering
"notorious" stock promoters.

47.    The Article denigrated LIVE, its growth potential, and its CEO and claimed that
LIVE's stock price had increased solely as a result of a paid promotional campaign funded by
LIVE and improper accounting tactics by the company's auditors. The Article included screen
shots of emails allegedly received by Richard Pearson reflecting the purported paid promotions,
although the recipient information for all such emails were blank and otherwise unpopulated,
leaving it unclear as to the identity of who actually received the emails or how they came to
appear in the Article.

48.    In addition, the Article focused in large part on Markowski, the only individual
unaffiliated with LIVE who was personally named in the article, and the articles he had written
and published on the Website. Significantly, the Article attached all of Markowski's work on
LIVE, including articles provided exclusively to his 22 paid subscribers and Seeking Alpha.

49.    The Article directly excerpted and summarized portions of Markowski's privately
published research. Because only Markowski's 22 paid subscribers *and SA* had access to the six
subscriber-only articles Markowski published, only Markowski's paid subscribers or SA itself
could have authored the Article.

4481428-5

50. The Article's purported author, Richard Pearson, was *not* one of Markowski's 22 paid subscribers. "Richard Pearson" would therefore have had no way to access or rely upon the six articles that Markowski published only to his subscribers.

51. Because Richard Pearson was not one of Markowski's paid subscribers, and because SA is the only party that had access to Markowski's private content apart from his paid subscribers, SA must have authored the Article. Indeed, Richard Pearson is a pseudonym, a fact well known to SA. In this instance, SA used that pseudonym to denigrate LIVE and to make false and defamatory statements regarding Markowski.

52. After extensive criticism of Markowski and his analysis, the Article concludes, "Live Ventures is a stock promotion that has been aggressively pumped by some of the most notorious stock touts in the business. These promoters have been paid millions of dollars to present skewed information on Live Ventures."

53. Throughout, the Article repeatedly refers to Markowski's LIVE articles in the same sentence as statements about the alleged paid promotional activity the Article claims that LIVE underwrote, falsely concluding that Markowski's researched content for which he was not paid—a fact prominently disclosed in his articles—was actually paid promotional content purportedly sponsored by LIVE. If Markowski were an undisclosed paid stock promoter, he would be engaged in illegal conduct, in violation of Federal anti-fraud statutes,. See 15 U.S.C. § 77q(b). For example, the Article states:

> "[Markowski's] articles on LIVE never appeared until a massive simultaneous paid promotion was being launched on Live Ventures, including payments of hundreds of thousands of dollars to paid stock promoters. As in past promotions, this surge in promotional activity coincided with a reverse split along with multiple apparent corporate developments. Yet these developments alone had no impact on the stock, instead it was the promotions

that boosted the stock. And these articles [by Markowski] only appeared at the exact same time as the promotions."

***

"The most recent stock bull to get behind Live Ventures is Michael Markowski. Markowski began writing about Live Ventures just as the paid promotion was picking up steam and he quickly put out 9 articles in just 6 weeks. He has aggressively urged readers to put in "at market" buy orders, driving up the stock. He analysis contains numerous statements which can be proven totally false with just a few minutes of checking."

54.     The Summary of the Article reinforces the point that Markowski is a paid stock promoter: "From November to December, Live ventures tripled on the back of aggressive paid promotions. Promoters have been paid as much as $2 million to hype Live Ventures. The same promoters as imploded fraud ForceField Energy, which was delisted and went to zero. Latest LIVE bull was permanently barred by the SEC for 'egregious' stock fraud."

55.     The Article describes the SEC charges from the 90's against Markowski as follows: "Markowski would use fraudulent means to induce customers to buy securities at manipulated prices and then his brokerage would prevent them from executing their sell orders (sometimes for months) even as the stocks plunged." The article defamed Markowski by stating that he was engaged in the same conduct regarding LIVE. "This is eerily similar to the content of his recent articles in which he keeps urging investors to buy 'at market' and then to buy more even after the stock tripled."

56.     The Article thus intentionally links together Markowski's unrelated and undisputed disciplinary history with the SEC to his authorship of the LIVE-related content. Specifically, the Article claims that Markowski published positive content related to LIVE in order to defraud investors for his personal benefit. After discussing Markowski's prior violations and disciplinary history with the Securities & Exchange Commission, "[a]s I see it, Mr.

4481428-5

Markowski has acted in a similar fashion with Live Ventures. He seeks to drive up the price in the same way, by inciting 'market orders' in a small cap, low float stock. He continues to urge additional buying even as the share price soars, continually raising his target price, using specific prices as he did in the fraudulent conduct above. He then seeks to dissuade investors from selling even as the share price begins to fall apart."

57.      The Article also falsely claims that Markowski is the "most recent stock bull to get behind Live Ventures" when three days after SA published Markowski's final article on LIVE, published on January 1, 2017, SA published Pantho Investments' article highlighting LIVE's company's upside and potential for immediate and significant growth. Because SA had removed the Pantho Investments' article, SA was able to convince readers that its false statements were true even though SA was fully aware that at least one other contributor, who published *after* Markowski, echoed Markowski's positive outlook on LIVE.

58.      The defamatory words, when construed in the overall context of the entire Article, are clearly and purposefully intended to lead SA's readers to infer that Markowski was a stock manipulator and a paid promoter for LIVE, who was using his LIVE-related content to effectuate a fraud by artificially inflating the price of LIVE stock.

59.      SA's motivation for authoring and publishing the Article is simple: it sought to create content SA knew would drive down the price of LIVE stock so that it could upsell its members to become subscribers and also for its members of its editorial team and its employees to establish short positions so that they could financially benefit from LIVE's share price declining swiftly and significantly so that they could make a fast profit.

60.      Since SA has an editorial team which reviews and fact checks every article for accuracy it was well aware that Markowski was not the only author recommending LIVE shares.

4481428-5

61.     While Richard Pearson has an active internet presence, no valid addresses or phone number can be found and his identity cannot be authenticated. The reason that Plaintiffs are unable to locate Richard Pearson is because Richard Pearson is a pseudonym for Seeking Alpha, the true author of the Article and the defamatory statements contained therein.

62.     As a direct result of the Article written by SA, DW, of which Markowski is the Director of Research, has been injured.

FIRST CAUSE OF ACTION
(Defamation *per se*)

63.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 62 as if fully set forth herein.

64.     SA's false statements of purported fact in the Article, which were published to SA's more than 10 million readers, concerning Markowski's participation in LIVE's alleged paid promotional campaign and Markowski's allegedly fraudulent behavior in connection with his recommendation to readers to purchase LIVE stock, constitutes defamation *per se*.

65.     The Article impugns Markowski's personal and professional integrity.

66.     Markowski has incurred and will continue to incur damages as a result of SA's false statements in the Article in an amount to be proved at trial, but in no event less than $10 million.

SECOND CAUSE OF ACTION
(Tortious Interference with Prospective Business Relations)

67.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 66 as if fully set forth herein.

68.     DW had prospective business relations with DW clients, members and potential members of its investment and consulting services.

69.     SA, by virtue of authoring the Article, interfered with those business relations.

16

70.    SA acted for a wrongful purpose and/or used dishonest, unfair or improper means in furtherance of authoring the Article.

71.    SA's improper acts injured DW's relationships with its members and potential members

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against Defendants for:

a)    On the First Cause of Action, an Order requiring Seeking Alpha to take down and forever remove the Article from its website, including any and all archives of the same;

b)    On the First Cause of Action, damages in the amount to be determined at trial, but in no event less than $10 million;

c)    On the Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $10 million.

d)    An award of costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

e)    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 6, 2018

OLSHAN FROME WOLOSKY LLP

By:   *Thomas J. Fleming*
      Thomas J. Fleming

*Attorneys for Plaintiffs*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

17

4481428-5